**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 05-0023-WS** |
| | ) | |
| **JEROME HARRIS, JR.,** | ) | **CIVIL NO. 08-CV-0158-WS** |
| | ) | |
| Petitioner. | ) | |

**ORDER**

This matter comes before the Court on petitioner Jerome Harris, Jr.'s *pro se* second amended petition for postconviction relief, which he has styled as "Verified Memorandum Brief in Support of Second Amended Motion under 28 U.S.C. § 2255" (doc. 155).

**I.      Factual and Procedural History.**

On the morning of October 3, 2004, the congregation at Mount Hebron Baptist Church in Mobile, Alabama witnessed quite a surprise during Sunday services. Jerome Harris, Jr., entered the church and deposited a cache of firearms and controlled substances at the altar, ostensibly in an act of religious revelation. The drugs and guns were secured by off-duty law enforcement officers who happened to be present, but Harris was not placed under arrest. Instead, one of those officers, Mobile Police Detective Patrick Sanders, spoke with him briefly and obtained contact information for him. That evening, Detective Sanders, who was at that time assigned to the Narcotics Division of the Mobile Police Department, requested that Harris appear at the Narcotics Division's offices the following morning. Harris agreed, and appeared as scheduled, whereupon he was interviewed by multiple Mobile Police Department officers. After several false starts, Harris admitted that the drugs and guns belonged to him and that he had been distributing narcotics for some time. Harris indicated that, during a cocaine binge that weekend, he had received a warning that the police were coming after him. Upon learning this information, Harris said, he had panicked that law enforcement would arrest him or execute a search warrant while he had the contraband in his possession. In his drug-induced state, Harris (with the participation of his wife and co-defendant, Leketa Harris) had formulated the plan of

disposing of these items at church.

In January 2005, a federal grand jury handed down an Indictment charging Harris with, *inter alia*, possessing with intent to distribute crack and powder cocaine, in violation of 21 U.S.C. § 841(a)(1), and knowingly using, carrying and possessing firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).  The above-described events of October 3 and 4, 2004 formed the factual predicate of the Indictment.

The case proceeded to trial before the undersigned on June 1, 2005.  At trial, the Government relied heavily on Harris's admissions to Mobile Police Department officers on October 4, 2004, as a means of proving both that he had intended to distribute the drugs that he brought to the church, and that he had used the firearms he took to the church as protection in furtherance of his drug-dealing activities.  Harris, who was represented at trial by retained attorneys James Brandyburg, Esq., and Jacqueline Brown, Esq., did not testify on his own behalf at trial.[1]  The jury returned guilty verdicts on both the § 841(a)(1) offenses and the § 924(c)(1) offense charged in the Indictment.  Based on the jury's verdict, the Court sentenced Harris to a term of imprisonment of 300 months, consisting of 240 months as to the § 841(a)(1) offenses and 60 months, to be served consecutively, as to the § 924(c)(1) offense.  Harris's conviction and sentence were affirmed on direct appeal.

Following his unsuccessful appeal, Harris timely filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255.  The grounds for Harris's § 2255 petition shifted substantially over time as he jettisoned certain theories of relief and engrafted others; however, all of these modifications were timely and were made with express leave of court. When the dust finally settled, Harris's stated grounds for collaterally attacking his sentence were

---

[1]      Defense counsel's representations to the Court during trial suggested that Harris's decision to testify or not would hinge on the admission or exclusion of the Government's proffered Rule 404(b) evidence of Harris's August 2001 conviction in state court for possession of cocaine.  When the Court deemed the evidence of Harris's previous drug conviction inadmissible under Rule 404(b), defense counsel indicated that Harris was not going to testify. Had he testified, that prior drug conviction would have become admissible against him as impeachment under Rule 609, notwithstanding the previous Rule 404(b) ruling.  Obviously, the calculus of whether or not to place Harris on the stand might have differed if evidence of his prior drug conviction were already before the jury.

-2-

confined to the following contentions of constitutional error: (1) "Counsel was constitutionally ineffective ... for failing to seek suppression of Mr. Harris's 10/4/04 statement"; (2) "Attorney James Brandyburg was constitutionally ineffective due to a conflict of interest which deprived Mr. Harris of the benefits of a cooperation based plea agreement offered by the United States"; and (3) "Mr. Harris was denied the effective assistance of counsel during his trial when attorney Brandyburg refused to allow Mr. Harris to testify truthful *[sic]* in violation of Harris's Fifth Amendment right."  (Doc. 155, at 2, 6, 8.)

After full briefing on Harris's § 2255 motion, the Court entered an Order (doc. 168) on January 6, 2009 opining that the numerous factual disputes and credibility determinations presented by the parties' filings, and Harris's specific factual allegations that, if true, would entitle him to relief, necessitated an evidentiary hearing.[2]  For that reason, the undersigned set this matter down for evidentiary hearing on April 8, 2009 and appointed Paul Bradley Murray, Esq., to represent petitioner at the hearing pursuant to Rule 8(c) of the Rules Governing Section 2255 Proceedings.  On the designated hearing date, the Court received an entire day's worth of evidence and argument from the parties, including live testimony from Harris, his wife, three of his former attorneys, and four officers of the Mobile Police Department.[3]  After careful review of the parties' written submissions, the testimony and exhibits presented at the evidentiary hearing and at trial, the arguments of counsel, and all other portions of the file deemed relevant, the Court is now prepared to rule on Harris's § 2255 motion.  Each of his three asserted grounds for

---

[2]      *Compare Aron v. United States*, 291 F.3d 708, 714-15 (11th Cir. 2002) (in § 2255 context, where petitioner "alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim") (citation omitted) *and United States v. Yizar*, 956 F.2d 230, 234 (11th Cir. 1992) (where § 2255 petitioner "has made sufficient allegations so that it cannot be *conclusively* stated that he is entitled to no relief, ... an evidentiary hearing must be held") *with Lynn v. United States*, 365 F.3d 1225, 1239 (11th Cir. 2004) (recognizing that evidentiary hearing is not required when § 2255 petitioner offers nothing more than conclusory allegations) *and Long v. United States*, 883 F.2d 966, 968 (11th Cir. 1989) ("A district court may deny relief under 28 U.S.C. § 2255 without an evidentiary hearing if the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.") (citations omitted).

[3]      The comprehensive nature of the hearing is underscored by the fact that the duration of Harris's § 2255 hearing exceeded that of his trial.

relief will be addressed in turn.

II.     **Analysis of Petitioner's Asserted Grounds for Relief.**

    A.     *Ineffective Assistance Claim Arising from Failure to File Motion to Suppress.*

Petitioner's first asserted ground for relief is that his attorneys rendered ineffective assistance, in violation of his Sixth Amendment rights, by failing to move to suppress the statements he gave at the Mobile Police Department offices.

    1.     *Ineffective Assistance Standard and Specifics of Harris's Claim.*

Binding precedent is clear that "[t]o obtain relief where an ineffective assistance claim is based on trial counsel's failure to file a timely motion to suppress, a petitioner must prove (1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006); *see also Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious ...."). The second element is dispositive here. Based on the evidence presented at the evidentiary hearing (which in some ways was tantamount to a post-trial suppression hearing), the Court finds that § 2255 relief is unwarranted on this claim because there was no underlying constitutional violation with respect to Harris's statements, such that any suppression motion would have failed.

Harris contends that the statements he gave at the Mobile Police Department were subject to suppression by operation of the exclusionary rule for the following reasons: (a) these statements were the product of custodial interrogation prior to which he was not given the mandatory *Miranda* warnings; (b) he was under the influence of cocaine and ecstasy at the time he made the statements, rendering them involuntary; and (c) law enforcement officers coerced him to make those statements by threatening to jail his wife if he did not answer their questions truthfully. (Doc. 155, at 3-4.) The credible evidence before the Court does not support any of these bases for suppression.

   2.   *Whether Harris's Statements Were Procured in Violation of* **Miranda**.

      a.   *Findings of Fact.*

Based on the evidence received at the hearing, as well as the relevant trial testimony, the Court finds the following pertinent facts concerning the *Miranda* issue: On October 3, 2004, Detective Sanders spoke briefly with Harris at Mount Hebron Baptist Church to inquire about the source of the weapons and controlled substances he had surrendered during worship services. Without offering any specifics, Harris advised Detective Sanders that he had taken these items from kids in the area.  Harris was not arrested that day; to the contrary, Detective Sanders believed Harris's story, felt that he had done an admirable deed by confiscating these drugs and guns, and plainly did not perceive Harris to be a suspect or a criminal.  So Harris was allowed to go home.  That evening, Detective Sanders spoke with Harris by telephone, and asked him to come in to the MPD Narcotics Division's offices the following morning so that Detective Sanders could introduce him to his supervisors.  Harris agreed.  No threats, coercion, or cajoling were utilized to persuade Harris to visit the police station; rather, he consented to do so of his own free will.  There was no reason to believe he would be interrogated or taken into custody by the MPD.

On the morning of October 4, 2004, Harris and his wife, Laketa Harris, voluntarily appeared at the Narcotics Division offices as requested at approximately 9 or 9:30 a.m.  They drove themselves to that location in their own vehicle, without being accompanied or escorted by law enforcement officers.  Upon arrival, they were not arrested or detained.  To the contrary, Detective Sanders (accompanied by his partner) greeted them, gave Harris a hug, and chatted with them amiably in general, casual conversation for approximately 30 minutes while awaiting the availability of his supervisors.  Thus, Harris was welcomed by law enforcement on the morning of October 4 as an upstanding citizen and a good Samaritan, rather than as a suspect or a criminal.

By approximately 10:00 or 10:30 a.m., Detective Sanders left the room, and Officer John Nixon entered to interview Harris.  The gravamen of Officer Nixon's questioning was to elicit specific information concerning how Harris came to possess the controlled substances and

firearms that he had brought to church the previous morning.[4]  When Officer Nixon began

questioning him, Harris was not in custody, had not been arrested, and was free to leave at any

time.  Nonetheless, at the outset of the interview, Officer Nixon advised Harris of his *Miranda*

rights, in accordance with standard procedures of the Mobile Police Department.[5]  Officer Nixon

spoke with Harris for approximately 90 minutes, in an effort to develop a rapport with him

before reaching the difficult and critical question of how Harris came to possess the weapons and

drugs he had brought to Mount Hebron Baptist Church.  Harris's answer was that he had driven

around Mobile, approached drug dealers on street corners, impressed upon them the error of their

ways, and persuaded them to relinquish these items to him for disposal.  Officer Nixon did not

believe him.[6]  Both the substance of Harris's narrative and the body language he conveyed in

---

[4]      Officer Nixon became involved and Detective Sanders ended his involvement
was Mobile Police Department supervisors' assessment that, to avoid any potential conflict, the
matter should be reassigned away from Detective Sanders given that he and Harris attended the
same church.  Thus, the assignment of Officer Nixon was not indicative of an upward ratcheting
of the scrutiny being given to Harris, nor did it alter his status as an individual voluntarily
present at the police station and free to leave at any time.

[5]      Officer Nixon's trial testimony was clear and unambiguous that he read Harris his
*Miranda* warnings before he commenced his interview.  (Trial Transcript (doc. 87), at 62.)
During the April 2009 evidentiary hearing, Officer Nixon reinforced this testimony by
explaining that he had read Harris his rights from a card at the beginning of his questioning.
According to Officer Nixon, he gave Harris his *Miranda* warnings as a precaution because he did
not know how that morning's events would unfold, or what Harris might say.  This was an
unusual situation, and Officer Nixon could not discount the possibility that, despite Harris's
voluntary appearance, he might end up in jail if he could not furnish a legitimate explanation for
the origins of the firearms and cocaine.  At the evidentiary hearing, Harris testified that Officer
Nixon did not Mirandize him before questioning him; however, based on the undersigned's
personal observation of the witnesses and an assessment of their credibility, plus Harris's
admitted dishonesty in other respects, and Officer Nixon's sensible explanation of why he made
a point of reading Harris his rights at the beginning of the interview, the Court credits Officer
Nixon's testimony, and does not credit Harris's contrary testimony, on this point.

[6]      Harris's testimony is that Officer Nixon became visibly perturbed, and even red-
faced, when he persisted in his false story about picking up drugs and guns from thugs on the
streets.  At that time, Harris said, he asked if he could leave, but Officer Nixon told him he could
not.  Leketa Harris likewise testified that Harris was told he could not leave before Officer Nixon
ushered him into Lt. Taylor's office.  For his part, however, Officer Nixon denied that Harris
ever indicated that he wanted to leave, or that he was going to go home.  Officer Nixon also

delivering it aroused strong suspicions in Officer Nixon as to its veracity.[7]  Notwithstanding his concerns, Officer Nixon did not confront Harris with the fact that his story was not credible, because he was attempting to maintain his rapport with Harris.  Instead, Officer Nixon excused himself and reported these developments to Lt. Kay Taylor, who was at that time the Commander for the MPD's Narcotics and Vice Unit.

Upon learning that Harris appeared to be fabricating an outlandish tale of how he came to possess the drugs and guns he had turned in, Lt. Taylor instructed Officer Nixon to bring Harris to her office.  He complied.  When Harris arrived in her office, Lt. Taylor challenged him by saying, in essence, that his story did not make sense and she did not believe him.  At that time, and prior to any substantive questioning by Lt. Taylor, Harris was presented with a form entitled "Warning and Consent to Speak," which recited his *Miranda* rights.  (Gov't Exh. 1.)  Officer Nixon read and explained the form to Harris, after which Harris signed it (with Officer Nixon

---

denied ever stating that Harris could not leave.  The Court does not credit Harris's testimony on this point, inasmuch as (i) it is implausible that Officer Nixon would have become visibly angry given his carefully designed strategy of developing a rapport with Harris and playing the "good cop," which would have been obliterated had Officer Nixon berated or scolded him; (ii) it is not credible that Harris would have asked to leave one time, then immediately dropped the subject and carried on with his cooperation as if nothing had happened; and (iii) Harris's dishonesty in various other aspects of his interactions with Mobile Police Department representatives that morning creates a substantial credibility deficit infecting the remainder of his testimony.  In addition, Leketa Harris's testimony is undermined in large part by its inconsistencies with her previous statements, as well as her admitted bias in wanting to help her husband prevail on his § 2255 motion.

[7]       As Officer Nixon testified, in his experience, street-level dealers typically do not own the drugs they sell, but are instead fronted them by bigger dealers, who must be reimbursed when the "product" is sold.  To hand over the drugs to a stranger on the street in an act of moral or spiritual revelation would be to invite potentially dangerous adverse repercussions from the suppliers who would still demand to be paid for the drugs, thereby placing the repentant dealer in a formidable fix.  Similarly, Officer Nixon explained, it struck a false note for Harris to suggest that he had persuaded drug dealers voluntarily to turn over the weapons on which they rely for protection.  These observations, rooted in Officer Nixon's many years of experience as a narcotics investigator, as well as the defensive posture (*i.e.*, arms folded, etc.) taken by Harris during this narrative, led him to conclude that Harris was lying.  Officer Nixon's suspicions in this regard were well-founded, as Harris admitted during the evidentiary hearing that this story was false.

and another officer also signing as witnesses) to confirm both his understanding of those rights and his waiver of same.  The form was signed at 12:40 p.m.[8]

By the time Harris entered Lt. Taylor's office and signed the *Miranda* form, the character of his visit to the Narcotics Division offices had changed.  Based on his implausible explanation to Officer Nixon, Harris was now reasonably viewed as a suspect by the Mobile Police Department.  More to the point for *Miranda* purposes, he was no longer free to leave.  Indeed, Lt. Taylor bluntly informed Harris that he might as well tell the truth and stop lying because he was going to go to jail anyway.[9]  Harris then told another obvious falsehood about the source of the drugs and guns, a gambit which he explained at the evidentiary hearing by stating that he was trying to protect himself.  Again, Lt. Taylor responded that she did not believe him, and pressed him for the truth.  After two iterations of patently fictional stories, Harris finally relented and provided a highly incriminating statement outlining his extensive drug distribution activities over a prolonged period of time.  In particular, Harris admitted to Lt. Taylor and Officer Nixon that he had been dealing in multiple kilograms of cocaine over the last 12 to 18 months, that he would sometimes cook crack cocaine in his own kitchen, and that he utilized the weapons during and in furtherance of his drug distribution activities.  (Trial Transcript, at 69-70, 90-91.)  At that time,

---

[8]    Lt. Taylor's testimony at the evidentiary hearing was emphatic that she would not have engaged in substantive discussions with Harris without a signed *Miranda* form.

[9]    According to Lt. Taylor's testimony at trial, when Harris first came into her office, "[i]mmediately, I asked if he had been advised of his rights, which he had. ... And at that time, I related to him, you are going to be arrested.  I stated the charge.  And I said, I do not believe what you said to the officer."  (Trial Transcript, at 102.)  Harris maintains that Lt. Taylor personally handcuffed him when he walked into her office; however, Lt. Taylor and Officer Nixon both denied it during the evidentiary hearing, and Harris's allegations concerning handcuffing have shifted several times during these § 2255 proceedings, such that he is not credible on this point.  Laketa Harris's testimony that she saw Harris handcuffed at around 11:30 a.m. is not helpful to petitioner, given that her hearing testimony conflicts with her pre-hearing affidavit as to the timing of the handcuffing, as well as her bias in desiring to aid her husband of seven years in his § 2255 petition.  Of course, even if Harris had been handcuffed in Lt. Taylor's office, it would not matter for *Miranda* purposes because he had already been informed of his rights twice.  Nor would the mere act of handcuffing render his confession involuntary.  *See Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) ("The use of handcuffs does not establish coercion.").

Harris also furnished the officers with the names of suppliers and other individuals with whom he had dealings in the drug trade.  Harris explained his behavior of the previous morning by telling Lt. Taylor and Officer Nixon that an individual named Ghost had tipped him off that the police were on the verge of "hitting him" with a search or arrest warrant.  Harris further explained that, because he had been on a drug binge at the time, he panicked and formulated the plan of turning over the contraband at church under the pretense of religious revelation.  (*Id.* at 71.)

> b.    *Conclusions of Law.*

Based on the foregoing findings of fact, Harris lacked any viable legal basis for suppressing the statements he gave to Officer Nixon and Lt. Taylor on October 4, 2004.  After conducting an evidentiary hearing and observing the credibility and demeanor of the witnesses, the Court has specifically found that Harris received oral *Miranda* warnings before Officer Nixon's interview of him commenced, and that he also received written *Miranda* warnings (and executed a waiver of same) at the outset of the Lt. Taylor interview.  Given these facts, it could not have been ineffective assistance for Harris's attorneys to fail to file a motion to suppress his statements to Officer Nixon and Lt. Taylor on *Miranda* grounds because Harris was duly Mirandized prior to making those statements.  Any motion to suppress addressed to that issue would have been denied, so counsel could not have rendered ineffective assistance by failing to file such a motion.[10]

That said, at least a portion of Harris's statements at the Mobile Police Department were made prior to his being advised of his rights.  But *Miranda* warnings are not required whenever law enforcement agents question a suspect; rather, they become mandatory only at the point when a custodial interrogation begins.  *See, e.g., United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) ("pre-custodial questioning does not require *Miranda* warnings"); *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (deeming it "undisputed that the right to *Miranda* warnings attaches when custodial interrogation begins"); *United States v. Muegge*, 225 F.3d

---

[10]    *See generally Chandler v. Moore,* 240 F.3d 907, 917 (11th Cir. 2001) (defense counsel is not ineffective for failing to raise a nonmeritorious issue); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance" of counsel).

1267, 1270 (11th Cir. 2000) (explaining that defendant must be advised of *Miranda* rights prior to questioning "only if the interrogation was custodial in nature").  Accordingly, this aspect of Harris's claim turns on whether he was in custody during police questioning prior to receiving *Miranda* warnings.

"A defendant is in custody for purposes of *Miranda* when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *United States v. Lopez-Garcia*, --- F.3d ----, 2009 WL 1044594, *7 (11th Cir. Apr. 21, 2009) (citation omitted).  The custody determination is an objective test, examining the totality of the circumstances and focusing on whether a reasonable person in the defendant's position would perceive a restraint on his freedom of movement such that he would not feel free to leave.  *See Street*, 472 F.3d at 1309; *Muegge*, 225 F.3d at 1271 ("The key inquiry in determining if interrogation was custodial is whether an innocent individual in that situation would feel free to leave ....").  Because the standard is an objective one, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *Street*, 472 F.3d at 1309 (citation omitted).  Rather, the relevant factors in this totality analysis include such details as whether officers brandished weapons, touched the suspect, or used language or a tone suggesting that his compliance could be compelled.  *See id.*

Applying the foregoing principles to the facts, the Court readily concludes that Harris was not in custody at any time prior to his being taken to Lt. Taylor's office.  He had come to the police station of his own free will, and arrived to find MPD officers welcoming him with smiles and hugs, rather than detention and interrogation.  He was not placed under arrest.  He was not handcuffed.  He was not locked in a room.  He was not told that he could not leave.  He was not physically restrained and his freedom was not restricted in any significant way at any time prior to the reading of his *Miranda* rights by Officer Nixon.  Indeed, under Eleventh Circuit precedent, Harris was not subjected to custodial interrogation, and therefore was not entitled to be advised of his *Miranda* rights, until Lt. Taylor told him that he might as well tell the truth because he was going to jail anyway.[11]  Up until that moment, no reasonable innocent individual in Harris's

---

[11]     In case after case, the Eleventh Circuit has found that defendants situated similarly to Harris (before he reached Lt. Taylor's office) were not in custody for purposes of

shoes would have felt that he was not free to leave. Of course, that was the very moment at which Officer Nixon went over the written *Miranda* form with Harris and advised him of his rights, after which Harris signed a waiver of those rights.

Simply stated, then, everything that occurred before Harris reached Lt. Taylor's office was not a custodial interrogation, such that *Miranda* warnings were not required at all.[12]  All questioning and statements that occurred after Harris walked into Lt. Taylor's office were custodial; however, those events transpired pursuant to a written *Miranda* waiver, so Harris could not validly have complained in a motion to suppress that those statements were taken in violation of *Miranda*.  Inasmuch as any motion to suppress that counsel might have filed on Harris's behalf would not have been meritorious, his ineffective assistance claim predicated on counsel's failure to seek suppression of his statements for violating *Miranda* must fail.

---

*Miranda*.  *See, e.g., Peoples v. Campbell*, 377 F.3d 1208, 1228-30 (11th Cir. 2004) (defendant was not in custody for *Miranda* purposes where he voluntarily went to police station and was not compelled to remain there); *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (no *Miranda* violation where defendant drove himself to police station in response to message left by officer, then gave an oral statement without ever being placed under arrest or restrained); *Hillary v. Secretary for Dep't of Corrections*, 2008 WL 4367437, *4 (11th Cir. Sept. 26, 2008) (no custodial interrogation where defendant voluntarily went to police station and talked with police about search in an attempt to recover jewelry that had been seized).  In one analogous case, the appellate court reasoned as follows:

> "[T]he statements made by Sullivan while he was in Sgt. Gardner's office were voluntary and not the product of a custodial interrogation. ... The pre-*Miranda* conversation between Sgt. Gardner and the petitioner does not reveal any of the significant restraint of freedom characteristic of a custodial interrogation.  Sgt. Gardner had no indication of the commission of a crime. ... His initial inquiry was merely an attempt to investigate and probe the situation.  Sullivan was not under arrest; he remained at the station of his own accord and freely answered the questions asked of him."

*Sullivan v. State of Ala.*, 666 F.2d 478, 482 (11th Cir. 1982).  The same could be said of Harris, at least until Lt. Taylor told him he was going to jail.

[12]      This is so, despite the Court's finding of fact that Officer Nixon did read Harris his *Miranda* rights at the outset of his interview.  In other words, the Mobile Police Department went above and beyond the constitutional floor of *Miranda*, and gave Harris warnings before the Officer Nixon interview even though they were not, strictly speaking, obliged to do so, given that there was no custodial interrogation at that time.

### 3. Whether Harris's Confession Was Involuntary Because of Intoxication.

To the extent that Harris contends that his trial counsel was ineffective in not failing to move to suppress his October 4 statements on grounds of intoxication, that ground for relief is likewise unavailing.

"It is settled that statements or confessions made during a time of mental incompetency or insanity are involuntary and, consequently, inadmissible. ... Voluntariness is premised on the totality of the circumstances." *Sullivan v. State of Ala.*, 666 F.2d 478, 482-83 (11th Cir. 1982) (citations omitted).  To be sure, intoxication is an appropriate factor that may be considered in assessing the voluntariness of a statement.  *See, e.g., United States v. LeShore*, 543 F.3d 935, 940-41 (7th Cir. 2008) ("[W]hen the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession.") (citation omitted); *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (noting that alcohol and drug use are relevant to analysis of voluntariness of confession).

But the record does not reveal any evidence that Harris was under the influence of any mind-altering substance when he presented himself at the Mobile Police Department.  Harris did not so testify at the evidentiary hearing.  Nor did Leketa Harris.  The police officers' testimony was unequivocal that Harris did not appear to be impaired on the morning of October 4.  As Officer Nixon testified at trial, "I could not tell that he was under the influence of any kind of drugs.  I smelled no alcoholic beverage about him.  He was steady on his feet.  He seemed to speak very well.  I didn't think he was under the influence of anything."  (Trial Transcript (doc. 87), at 63.)  Officer Nixon was quite clear that "[i]f he would have been under any kind of controlled substance or alcohol that I could detect, we would not have interviewed him."  (*Id.* at 85.)  Officer Nixon echoed these same observations and impressions at the evidentiary hearing, noting also that Harris seemed steady on his feet, spoke plainly, did not exhibit bloodshot eyes or dilated pupils, and appeared responsive and in control.  At trial, Lt. Taylor was equally emphatic that Harris's demeanor was such that he did not appear to be under the influence of drugs or alcohol.  As she testified, "Had he been under the influence or even had given the appearance of being under the influence, there is no way we would have conducted, not in our office, an interview or interrogation of Mr. Harris."  (*Id.* at 115.)  This credible testimony has not been

-12-

effectively rebutted by petitioner.

In short, then, the Court finds no evidence that Harris was in a biologically or chemically coercive mental state when he made the statements to law enforcement officers on October 4, 2004.  The uncontradicted evidence before the Court is that he appeared to be sober and in full control of his faculties.  As the record does not support a conclusion that Harris was so impaired by his abuse of cocaine, ecstasy and other controlled substances during the previous weekend that his confession was unintelligent or involuntary, it could not have constituted ineffective assistance for Harris's trial counsel to refrain from filing a motion to suppress on an intoxication theory.[13]

### 4.      Whether Harris's Confession Was Inadmissible Because of Coercion.

Next, Harris argued in his § 2255 filings that his counsel was constitutionally ineffective for failing to move to suppress his October 4 statements on grounds they were coerced and, therefore, inadmissible.

It is a matter of black-letter law that "[t]he Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial."  *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005).  To be admissible, the statement must be "the product of a free and deliberate choice, rather than intimidation, coercion or deception."  *Id.* (citations omitted). "We determine whether a defendant's statement is 'involuntary' under a 'totality of the circumstances' test."  *Taylor v. Singletary*, 148 F.3d 1276, 1280 (11th Cir. 1998); *see also Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989) ("A confession is voluntary if, under the totality of the circumstances, it is the product of the defendant's free and rational choice.").  As a general proposition, however, "[a]bsent any evidence of psychological or physical coercion on the part of the agents, there is no basis for declaring [a defendant's] statements and consent to search

---

[13]      Appellate authorities support the conclusion that any motion to suppress Harris's statements on grounds that his intoxication rendered them involuntary would have been futile, given these facts.  *See, e.g., Hubbard v. Haley*, 317 F.3d 1245, 1253-54 (11th Cir. 2003) (defendant's confession was not rendered involuntary by intoxication where witnesses testified that defendant did not appear to be intoxicated when he gave statements at police station); *Grayson v. Thompson*, 257 F.3d 1194, 1230 (11th Cir. 2001) (denial of defendant's motion to suppress confessions on intoxication grounds was not error where officer testified that defendant did not smell of alcohol, was not slurring his speech, and had a normal demeanor).

involuntary." *Thompson*, 422 F.3d at 1297 (citing *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995)).

Harris contends that his statements were coerced because MPD interrogators threatened to put his wife in jail unless he told them the truth.[14] But the Court finds, as a factual matter, that no such threat was ever made.  During the evidentiary hearing, Officer Nixon credibly testified that he neither told Harris nor heard anyone else tell Harris that Leketa Harris would be jailed unless Harris told them the truth.  Rather, Officer Nixon testified that at no time on October 4, 2004 did he hear anyone at the MPD raise their voices at Harris, shout at him, threaten or coerce him in any way.  Lt. Taylor similarly testified at the hearing that she never advised Harris that his wife would go to jail if he failed to tell the truth.  Based on direct observations of the witnesses' credibility and demeanor during the hearing, the Court credits the testimony of Officer Nixon and Lt. Taylor on this point, and does not credit Harris's testimony to the contrary.  There was no improper coercion or intimidation of Harris.  At most, the record reflects that Lt. Taylor exhorted Harris to tell the truth because he was going to jail anyway.  Such an admonition falls far short of rendering his statement involuntary.  *See United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983) ("[A] mere admonition to the accused to tell the truth does not render a confession involuntary."); *United States v. June*, 2009 WL 464471, *1 (9th Cir. Feb. 25, 2009) ("A police officer's repeated exhortations to tell the truth do not amount to coercion.").[15]

---

[14]     Harris's testimony was that when he went into Lt. Taylor's office, she instructed him to stop lying and informed him that if he did not tell the truth, his wife would go to jail too.  According to Harris, Lt. Taylor repeated the threat to coerce him into signing the *Miranda* form after he had already given his statement, such that Harris signed the form after the fact solely for the purpose of keeping Leketa Harris out of jail.

[15]     Even if Harris's testimony were credible that Lt. Taylor threatened to detain his wife unless he confessed, that fact would be legally inadequate to justify suppression of his statements in this context.  The mere statement that a family member may be jailed if the accused does not confess does not automatically render a confession involuntary absent a showing that the defendant's will was overborne.  *See, e.g., United States v. Gannon*, 531 F.3d 657, 661-62 (8th Cir. 2008) (even if defendant's testimony were true that detectives told him that his ex-wife would be charged unless he confessed, that fact would not render his statements involuntary in the absence of evidence that his will was overborne and his capacity for self-determination critically impaired); *United States v. Wyche*, 307 F. Supp.2d 453, 464 (E.D.N.Y. 2004) ("A threat to a suspect to charge a third party with a crime, a crime that the third party is

5.      **Conclusion.**

Harris collaterally attacks his sentence in his § 2255 petition on the ground that his attorneys should have filed a motion to suppress to keep out the deleterious admissions he made to law enforcement officers on October 4, 2004.  As the foregoing discussion reflects, however, any motion to suppress that counsel might have filed on theories of *Miranda* violations, intoxication, or coercion/threats would have been beset by glaring factual and legal infirmities, and would not have succeeded.  Inasmuch as Harris has identified no meritorious basis for any motion to suppress, the Court cannot find that his lawyers' failure to file such a motion was a

---

also plausibly guilty of, does not make that suspect's subsequent confession inadmissible.  While it would have been improper (and unchivalrous) to actually charge the pregnant woman under the circumstances presented, it was not illegal for [police officers] to threaten [defendant] with their willingness to do so."); *United States v. Rodgers*, 186 F. Supp.2d 971, 976 (E.D. Wis. 2002) (indicating that "a police officer's suggestion of possible adverse consequences to a suspect's friend or loved one is not always improper," such as where the suggestion is "an honest statement of a possible outcome"); *United States v. Ponce Munoz*, 150 F. Supp.2d 1125, 1135 (D. Kan. 2001) ("Informing a defendant that ... his wife could go to jail ... if the defendant did not cooperate does not render his confession involuntary when these events are merely consequences of defendant's illegal acts").  Harris's testimony was simply that the words were spoken, without elaborating on their coercive effect.  Harris made no showing that his will was overborne by the threat that his wife would be jailed, and the record evidence is to the contrary.  After all, the record reflects that Harris was not close with Leketa Harris at that time.  They were not living together, and there was even evidence that Harris was living with another woman.  Certainly, Harris never testified that the prospect of her going to jail was so painful and emotionally charged that his will was overborne and he was compelled to confess.  Moreover, it is important to remember that Leketa Harris was hardly an innocent bystander.  She bore criminal culpability herself because Harris had drawn her into his illegal activities.  The information before the MPD officers was that, at a minimum, Leketa Harris had been complicit in Harris's acts of transporting and disposing of the drugs and guns at the church, such that it was entirely plausible that she had committed a crime.  It was more than plausible; indeed, Leketa Harris ultimately pleaded guilty in federal court to the offense of misprision of a felony, as a result of her unlawful conduct on October 3, 2004.  Thus, there was plainly a reasonable factual basis for Lt. Taylor to jail Leketa Harris that day, just as Harris testified she threatened to do.  In these circumstances, any suggestion to Harris that his wife might go to jail would have been an accurate statement of fact, given Leketa Harris's own criminal acts in connection with the disposal of Harris's drugs and guns.  Therefore, even if the Court were to decide the credibility question in Harris's favor concerning the possible detention of his wife, the outcome would be the same.  His confession was not coerced, as a matter of law, and his constitutional rights were not violated by his trial counsel's failure to move to suppress that confession on grounds of involuntariness or coercion.

course that no competent counsel would have taken under the circumstances.  As such, petitioner has failed to satisfy his burden of establishing constitutionally deficient performance, as required to sustain an ineffective assistance claim.  *See, e.g., Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (to meet high burden of establishing that counsel's performance was deficient, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take").  This ground for Harris's § 2255 motion is meritless.

> **B.      *Ineffective Assistance Claim Arising from Alleged Conflict of Interest.***

The second ground for § 2255 relief identified by Harris is that "Attorney Brandyburg was constitutionally ineffective due to a conflict of interest which deprived Mr. Harris of the benefits of a cooperation based plea agreement offered by the United States."  (Doc. 155, at 6.)  Harris's theory is that Brandyburg was representing individuals named James Demetrius "J.D." Hunt and Samuel Lee Jones, Jr., simultaneously with his representation of Harris.  According to petitioner's filings, this representation of Hunt and Jones created a conflict because Harris, in attempting to secure a plea agreement with the Government based on cooperation, possessed incriminating information as to both Hunt and Jones.  Harris's filings alleged that when he attempted to disclose such information to the Government, Brandyburg suspended the debriefing interview and steered Harris on a course for trial, rather than a guilty plea, all to protect his other clients at Harris's expense.

> **1.      *Findings of Fact Concerning Conflict of Interest Theory.***

The facts that emerged during the evidentiary hearing were not consistent with this theory of malfeasance.  Brandyburg, an experienced criminal defense attorney, testified that the first time he represented Hunt was when he was appointed on May 27, 2005, and that he had never even heard of Hunt before that date.  By contrast, the events concerning Harris's proffer and debrief took place in mid-April 2005, approximately six weeks before Brandyburg ever came to represent Hunt.  None of this evidence was controverted or challenged at the hearing.  Thus, the record plainly establishes that Brandyburg began representing Hunt well after the plea negotiations and proffer events that underlie Harris's conflict of interest allegations in the § 2255 petition.

As for Jones, the circumstances were somewhat different.  Brandyburg testified that he represented Jones in a series of juvenile, civil and criminal matters in state court beginning in

approximately 2000.  This ongoing legal representation encompassed state-court charges of possession of marijuana and drug paraphernalia, in which matters Brandyburg filed a notice of appearance on April 20, 2005, as well as a federal controlled substances prosecution in which Brandyburg began representing Jones in early May 2005.  Without question, at the time of Harris's mid-April 2005 proffer, Brandyburg had a longstanding attorney-client relationship with Jones, and was apparently actively representing him in a drug case pending in state court.  Based on this testimony, the Court finds that Jones was an ongoing client of Brandyburg's, and that Brandyburg represented Jones at the same time that he was representing Harris in plea negotiations with the Government.

Of course, to find that Brandyburg had temporally overlapping attorney-client relationships with Harris and Jones is not necessarily to find that Brandyburg's representation of Harris was compromised by a conflict of interest.  The critical facts relate to Harris's debrief session and the circumstances that led to its termination and the abandonment of Harris's cooperation/guilty plea strategy.  Brandyburg testified that Government agents unilaterally terminated Harris's debriefing in abrupt fashion because they did not believe Harris was being truthful.[16]  Brandyburg's recollections on this point are bolstered by the testimony of the Government's case agent, Cpl. Joe Wolfe of the Mobile Police Department.  Cpl. Wolfe testified that he participated in a debrief session with Harris and his attorney, but that Cpl. Wolfe called the interview off shortly after it began because he and other agents who were present felt that Harris was not providing truthful information.

Harris's account stands in stark contrast to those of his former attorney and the Government's case agent.  According to Harris, he and Brandyburg met with Officer Nixon for purposes of cooperation.  At that meeting, Harris testified, he provided detailed information concerning his drug suppliers, only to have Brandyburg suddenly cut off the proffer after Officer Nixon showed Harris photographs of Jones and other suspects.  According to Harris, Brandyburg explained this conduct by saying that Harris had given enough information.  Before the debriefing ended, Harris said, he shared with the Government what he knew about Jones, namely

---

[16]     Brandyburg also testified that Harris never mentioned Jones during this debrief session.

that he had seen Jones on a number of occasions with drugs, and had had opportunities to buy drugs from Jones, but had not done so because he was afraid that Jones would tell on him. This version of the facts is not credible, and does not make sense. Had Harris been supplying good information to law enforcement at this debriefing, and had the officers believed him, there should be records to confirm it. There are none. Had an attorney squelched his own client's cooperation in such a sudden, unprovoked, irrational and overt way, the Court is confident that the Government would have followed up appropriately with defense counsel and, if necessary, the Court to ascertain what was happening. That did not occur. Moreover, Harris admits that he had already told the Government what he knew about Jones. If Brandyburg were truly trying to protect Jones, why would he have waited to terminate the interview until after Harris had shared what little information he had about Jones? It does not make sense that Brandyburg would so forcefully close the barn door after the horses had already escaped. And, more fundamentally, the fact remains that the Government agents did not believe anything Harris was telling them. He had already revealed a propensity for dishonesty by virtue of the three different stories he had floated to the MPD on October 4, 2004. Nothing he said at the debrief session helped his cause in the eyes of the Government or altered their impression of him as a chronically untrustworthy witness. Based on the foregoing, the Court finds that Harris's debriefing was terminated not by Brandyburg because of a clandestine conflict, but by the Government because of their dissatisfaction with the quality and sincerity of Harris's cooperation.[17]

---

[17]    Part and parcel of Harris's conflict of interest theory is the notion that Brandyburg not only derailed the debriefing, but also prevented Harris from entering into a cooperation-based plea agreement, all for the sake of protecting Jones. Harris blames Brandyburg for the fact that Harris went to trial even though the Government was offering him a favorable plea arrangement under which he might have served as little as five years in prison, rather than the 300 months he ultimately received after trial. (*See* Defendant's Exh. 1.) By all appearances, Harris himself caused that plea offer to be withdrawn by failing to cooperate truthfully. More importantly, even if that offer had remained on the table, the facts do not support Harris's contention that he went to trial only because of Brandyburg's loyalties to Jones. The credible evidence at the hearing was Brandyburg's testimony that the reason Harris never signed the Government's proposed plea agreement and factual resume was that Harris had made the decision to go to trial, against the strong advice of his attorneys that he enter a plea of guilty and cooperate. In other words, Harris went to trial not because he was sandbagged, misled or cajoled by his lawyers not to follow the path of cooperation, but because he ignored their advice and

### 2.      *Conclusions of Law Concerning Conflict of Interest Theory.*

To obtain relief on a § 2255 motion predicated on a conflict of interest impairing one's Sixth Amendment right to counsel, "a defendant must show *first*, that his attorney had an actual conflict of interest, and *second*, that the conflict adversely affected counsel's performance." *Pegg v. United States*, 253 F.3d 1274, 1277 (11th Cir. 2001).  To satisfy the "actual conflict" requirement, a petitioner "must show something more than a possible, speculative or merely hypothetical conflict ... [He] must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative [courses] of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Reynolds v. Chapman*, 253 F.3d 1337, 1342-43 (11th Cir. 2001) (citations omitted); *see also Quince v. Crosby*, 360 F.3d 1259, 1264 (11th Cir. 2004) ("An 'actual conflict' of interest occurs when a lawyer has 'inconsistent interests.'").  To satisfy the "adverse effect" requirement, "a habeas corpus petitioner must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense."  *Pegg*, 253 F.3d at 1278; *see also Quince*, 360 F.3d at 1264.

Clearly, there was no conflict of interest with respect to James Demetrius Hunt.  Brandyburg was not representing Hunt in April 2005, and did not even know who Hunt was at the time of Harris's debrief and plea negotiation.  Moreover, Harris failed to present evidence at the hearing that Hunt's name ever surfaced during the proffer session, that the Government agents ever asked him about Hunt, or that he possessed any inculpatory information concerning Hunt.  On that basis, the Court finds that Brandyburg did not have any actual conflict with respect to Hunt that might have impaired Harris's Sixth Amendment right to counsel.

As for Sam Jones, the Court likewise concludes that Harris has failed to show that

---

decided to roll the dice at trial with an ill-conceived "religious revelation" defense that he hoped would set him free, even though Brandyburg warned him that such a defense was highly problematic and likely to fail.  That Harris's risky (and perhaps even foolhardy) decision to go to trial rather than taking the plea deal did not pan out as he had hoped is hardly imputable to his counsel as a constitutional violation, particularly where Harris's decision ran contrary to his lawyers' recommendations.

-19-

Brandyburg was rendered ineffective by a conflict of interest.  As an initial matter, the undersigned is not convinced that Brandyburg was facing "inconsistent interests" as between Harris and Jones.  To be sure, Harris had an interest in providing the Government with whatever inculpatory information he had concerning Jones, and Jones of course had a countervailing interest in no such information being provided.  But the credible testimony from the hearing is that Jones' name never came up.  Harris was neither asked about Jones nor offered any information about Jones during the debrief.  That being the case, Brandyburg was never placed in a position of split loyalties, where he had to choose between protecting Jones and helping Harris.  The actual conflict never materialized.  Even if it had, Harris has failed to show that any such conflict adversely affected Brandyburg's performance, which is a necessary element to establishing a constitutional violation.  Accepting Harris's testimony at face value, Brandyburg did not stop him from telling the Government what he knew about Jones, which was not much because Harris denied ever purchasing drugs from Jones but instead indicated merely that he saw Jones in the neighborhood with drugs.  Thus, Harris's story is that Brandyburg did not prevent him from disclosing to the Government everything he knew about Jones, notwithstanding the alleged conflict.  Additionally, the Court has made a finding of fact that it was the Government, and not Brandyburg, who brought a premature halt to Harris's debrief session because they thought he was lying.  That fact shows that Brandyburg did not stand in the way of Harris's cooperation and did not scuttle Harris's cooperation to help Jones.  As such, there was no adverse effect from any actual conflict that Brandyburg may have faced as between Harris and Jones, and Harris's request for § 2255 relief on the ground that his attorney labored under a conflict of interest that rendered him constitutionally ineffective is unfounded.

### C.     *Ineffective Assistance Claim Arising from Defendant's Right to Testify.*

The third and final ground for relief identified in the § 2255 petition is Harris's contention that his lawyers would not allow him to testify at trial.  As the petition frames the issue, Harris maintains that he "was denied the effective assistance of counsel during his trial when attorney Brandyburg refused to allow Mr. Harris to testify truthful [*sic*] in violation of Harris's Fifth Amendment right."  (Doc. 155, at 8.)  In his supporting declaration, Harris elaborates on this claim by asserting that counsel had convinced him that it was up to them, and not up to him, whether he would take the stand at trial.  (Harris Decl. (doc. 155-2), ¶ 22.)

The law is clear that "a criminal defendant has a *fundamental* constitutional right to testify in his or her own behalf at trial.  This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (*en banc*); *see also McGriff v. Dep't of Corrections*, 338 F.3d 1231 (11th Cir. 2003) ("The law is well-established in this Circuit that a criminal defendant has a fundamental constitutional right to testify in his own defense.").  The Eleventh Circuit has held that "an ineffective assistance of counsel claim is the appropriate vehicle for a criminal defendant to raise an alleged violation of his right to testify." *United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998); *see also Teague*, 953 F.2d at 1534 (similar).  That is precisely the form that Harris's claim has taken; therefore, the Court evaluates this ground for § 2255 relief (*i.e.*, that counsel violated his constitutional rights by not allowing him to testify at trial) by reference to the legal standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  *Strickland* provides that a petitioner making a claim of ineffective assistance of counsel "must show that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense." *McClain v. Hall*, 552 F.3d 1245, 1250 (11th Cir. 2008) (citation omitted).

With respect to deficient performance, the Eleventh Circuit has recognized that a lawyer's performance may fall outside the range of competence demanded of attorneys in criminal cases if either (a) "defense counsel refused to accept the defendant's decision to testify and would not call him to the stand;" or (b) "defense counsel never informed the defendant of the right to testify and that the ultimate decision belongs to the defendant." *Teague*, 953 F.2d at 1534; *see also Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999) (counsel's performance is deficient for *Strickland* purposes "[w]here counsel has refused to accept the defendant's decision to testify and refused to call him to the stand, *or* where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone") (emphasis added).[18]  Harris has alleged in his filings, and testified at the

_____

[18]     For a defense attorney simply to tell the defendant that the latter has a right to testify is not sufficient to satisfy the constitutional minimum level of performance.  *See McGriff*,

hearing, that Brandyburg's performance was deficient in both of these respects.  In particular, Harris stated that his attorneys never told him that the decision of whether or not to testify was his alone, and that his attorneys refused to honor his express wish to take the stand at trial. While the Government offered substantial evidence at the evidentiary hearing that Harris agreed with Brandyburg's position that he should not testify, there was no evidence to rebut Harris's testimony that Brandyburg led him to believe that the final decision rested with the lawyers.[19] As a result of this omission, the only information this Court has before it concerning what Brandyburg told Harris about his right to testify is Harris's own testimony that Brandyburg never advised him that the final decision of whether or not to testify was Harris's.  In this incomplete and undeveloped posture, the record leaves significant unanswered questions as to whether counsel rendered deficient performance under *Teague* and its progeny.

That said, it is not necessary to address the deficient performance prong for this particular § 2255 claim.  Indeed, "a court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied."  *Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir. 1995); *see also McClain*, 552 F.3d at 1251 ("We may decline to decide whether the performance of counsel was deficient if we are convinced that [defendant] was not prejudiced."); *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed.").  This is just such a circumstance.  The Court having the firm conviction that the *Strickland* prejudice standard is not met here, no determination need be made as to the sufficiency of counsel's performance in advising Harris of his right to testify.

---

338 F.3d at 1237 ("Counsel must advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify. ... Absent such advice, the defendant cannot effectively waive his right to testify.").

[19]     At most, Brandyburg testified that his general practice is to tell defendants that they have a constitutional right to testify, but that in most cases they would be better off not testifying because of the potential for adverse information (such as prior convictions) to emerge on cross-examination.  Brandyburg did not testify as to whether he did or did not follow this general practice in Harris's case, and never indicated whether he did or did not inform Harris that the final decision of whether or not to testify was Harris's to make.

To show prejudice under *Strickland*, Harris must show that, but for any deficient performance by counsel as to his right to testify, "there is a reasonable probability that ... the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Hannon v. Secretary, Dep't of Corrections*, 562 F.3d 1146, 1151 (11th Cir. 2009) (citing *Strickland*, 466 U.S. at 694); *see also Wood v. Allen*, 542 F.3d 1281, 1310 (11th Cir. 2008) ("A petitioner must affirmatively prove prejudice.") (citation and internal quotation marks omitted); *Lambrix v. Singletary*, 72 F.3d 1500, 1508 (11th Cir. 1996) ("a defense attorney renders ineffective assistance if he fails to adequately inform his client of the right to testify, ***and that failure prejudices the defense***") (emphasis added).

To satisfy his burden of showing prejudice, Harris indicated at the evidentiary hearing that he wanted to testify at trial and suggested that he would have testified if he had known the decision was his to make.  But simply to say that he would have testified had he known the decision was his is not enough to establish prejudice.  There is no *per se* or presumed prejudice in this context.[20]  Whether Harris was prejudiced by his lawyer's alleged deficient performance concerning his right to testify hinges on what Harris would have told the jury at trial and whether that testimony, when weighed against the other evidence before the jury, had a reasonable probability of making a difference in the outcome.  The Court underscored the importance of these questions in its Order setting this matter for hearing, wherein it opined as follows: "the Court cannot assess whether it is reasonably probable that Harris's testimony would have

---

[20]     *See Franklin v. United States*, 2007 WL 1600028, *4-5 (11th Cir. June 5, 2007) (in right-to-testify context, explaining defendant must show prejudice under *Strickland* by establishing that it was reasonably probable that defendant's testimony would have changed the outcome of the trial, and rejecting defendant's suggestion on appeal that only some lesser threshold of proof was needed in the right-to-testify context); *United States v. Tavares*, 100 F.3d 995, 998 (D.C. Cir. 1996) (declining to find that deficient performance resulting in denial of defendant's right to testify constitutes prejudice *per se*, but instead adhering to *Strickland* test of "whether it is reasonably probable that the defendant's testimony would have changed the outcome of the trial in his favor"); *Haynes v. United States*, 451 F. Supp.2d 713, 725 (D. Md. 2006) ("even counsel's total failure to advise a defendant of his right to testify does not constitute prejudice *per se*"); *Arins v. McNeil*, 2008 WL 2264503, *12 (S.D. Fla. Mar. 28, 2008) ("Where the record establishes no reasonable probability that the defendant's asserted testimony would have changed the outcome of the trial, the defendant has failed to make a *prima facie* showing of prejudice.").

changed the outcome of the trial in his favor without hearing and evaluating the credibility of his testimony on the witness stand." (Order (doc. 168) dated January 6, 2009, at 18.) At the hearing, however, Harris made no proffer of what he would have told the jury at trial had he testified. Harris therefore chose to forego the opportunity to allow this Court to assess the credibility of the proffered testimony he would have presented at trial. This omission, in contravention of the January 6 Order, compels a conclusion that Harris has failed to meet his burden of establishing prejudice on the right-to-testify issue.[21]

Harris has failed to meet his burden of demonstrating a reasonable probability that the outcome of his trial would have been different had he been permitted to testify at trial; therefore, he has not satisfied the *Strickland* prejudice standard, and this ground for relief set forth in his § 2255 petition is without merit.

**III.    Conclusion.**

For all of the foregoing reasons, petitioner Jerome Harris, Jr.'s second amended motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (doc. 155) is **denied**. A

---

[21]    At most, Harris alluded vaguely to changes in his life and indicated that he was the only one who could tell the jury about what had happened to him to make him change his ways away from his drug-dealing past. So apparently Harris wanted to tell the jury that he had experienced a religious revelation which prompted him to disavow his controlled substances activities and turn them in at the church. The fundamental defect with such testimony is that it would not constitute a defense to the charges against him. Even if Harris actually did experience a sudden spiritual awakening in the midst of his cocaine binge of October 1 and 2, 2004, the compelling evidence remained that (1) he was an admitted longtime drug dealer; (2) he was in possession of distribution quantities of cocaine and multiple firearms on the morning of October 3, 2004; (3) he lied repeatedly on the morning after his alleged religious revelation in an attempt to deceive law enforcement officers; and (4) he ultimately admitted that he brought the drugs and guns to church for the purpose of avoiding detection and capture by law enforcement officers whom he believed were about to arrest him. It appears that Harris essentially wanted to give the jury a ground for nullification by evoking their sympathy as a newly-saved Christian, despite his previous drug-dealing ways. Such a ploy had no meaningful likelihood of success, particularly where his testimony would have been accompanied by the introduction of evidence on cross-examination of his prior felony drug conviction, where the jury was aware of the three other explanations for his conduct he had given to the MPD, and where the record contained abundant evidence of Harris's propensity for dishonesty and calculating, self-serving subterfuge.

-24-

separate judgment will enter.[22]


      **DONE** and **ORDERED** this 11th day of May, 2009.


                         s/ WILLIAM H. STEELE
                         UNITED STATES DISTRICT JUDGE

---

[22]       The Court appointed counsel, Paul Bradley Murray, Esq., to represent Harris in connection with the evidentiary hearing in this matter, pursuant to Rule 8(c) of the Rules Governing Section 2255 Proceedings.  That hearing having been concluded, and there being no circumstances that might warrant continued involvement of counsel in these proceedings, the appointment of Murray to represent Harris herein is **terminated**.